**XTRA LEASE, INC., Plaintiff,**

v.

**THE UNITED STATES, Defendant,**

and

**TIP Government Services, Intervenor.**

No. 01–181C.

United States Court of Federal Claims.

Originally filed Sept. 17, 2001.

Reissued for publication Oct. 3, 2001.

Brian Wheatley Craver, Washington, D.C., attorney of record for plaintiff.

F. Jefferson Hughes, Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director. Alexa Zevitas, United States Postal Service, of counsel.

Claude P. Goddard, Jr., Vienna, Virginia, counsel for intervenor TIP Government Services.

## OPINION[1]

FUTEY, Judge.

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record. Plaintiff

---

1. This opinion was originally issued and filed under seal on September 17, 2001. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. Neither party submitted proposed redactions. The opinion is hereby released for publication as originally issued.

contends it has standing to bring this case because it has a substantial chance of receiving the disputed contract (Contract) if it is resolicited. Plaintiff also asserts the court has jurisdiction to consider this protest as the United States Postal Service (USPS) is a federal agency. With respect to the merits of its claim, plaintiff maintains defendant acted arbitrarily and capriciously when it extended the Contract's first delivery date after plaintiff withdrew from the solicitation. Plaintiff also challenges the Contract's requirement for an anti-lock braking system (ABS) as unduly restrictive. Plaintiff argues the court should issue a permanent injunction and order a resolicitation of the Contract because defendant's actions were irrational and in violation of the USPS Purchasing Manual (PM). In the alternative, plaintiff requests bid proposal costs.

Defendant claims plaintiff does not have standing to support its protest because plaintiff withdrew from the solicitation prior to the Contract's award. Defendant also argues that USPS is not a federal agency. In addition, defendant asserts its actions were within the standards of the PM, and were not arbitrary and capricious. Defendant challenges plaintiff's request for injunctive relief and resolicitation as unnecessary. The awardee, TIP Government Services (TIP), has intervened as defendant and, unless noted, its arguments do not materially differ from defendant's.

### Factual Background

Plaintiff, XTRA Lease, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Defendant, the United States of America, is acting by and through its agent[2] USPS. Since it received the Contract, TIP is defendant-intervenor.

On April 28, 2000, defendant issued Solicitation No. NTL 00–001 (Solicitation) for the lease of 4,406 mail delivery trailers complying with detailed specifications unique to USPS. Defendant conducted the procurement under the authority granted by its reg-ulations, which are contained in Issue 1 of the 1997 USPS PM. The PM contains detailed, mandatory provisions governing the contents of the Solicitation and the conduct of this USPS procurement. The Solicitation established a set of contracts to replace a large number of trailer leasing contracts ending at various dates in 2000 and 2001. Defendant entered these previous contracts under multiple solicitations by separate Distribution Network (DN) offices and by other large postal processing plants. The Solicitation sought proposals to lease trailers for seven DN groups, but allowed either a single national award of all groups to one party or multiple awards of individual groups to different parties. The period of performance was six years with an option to renew for six more years.

The Solicitation required ABS to be included on each trailer. It also mandated that delivery of the trailers to various regional sites around the country be conducted in two groups. Delivery Date A involved 1,637 trailers to be delivered by September 10, 2000. Delivery Date B was set for July 1, 2001, for the remaining 2,769 trailers.

The Solicitation required a two-stage process for selecting the awardee. In the first stage, it asked offerors to submit written technical proposals for any or all DN groups by May 26, 2000, for evaluation by USPS. An offer for a specific DN group needed to include all trailers required in that group. If defendant accepted an offeror's proposal in the first stage, it became prequalified for the second stage, an online reverse auction referred to as a "competitive bidding event" (CBE) to be held on June 8, 2000. The CBE consisted of each offeror submitting prices expressed in terms of daily rental rates for each trailer. All offerors could view each other's proposed prices during the event. Solicitation Article K.2 stated that "After the CBE has begun and the offeror has submitted a price bid, it may not withdraw its proposal prior to the expiration of the proposal acceptance period."[3] This acceptance period lasted for 60 days after the date of the

---

**2.** As discussed below, defendant contests whether USPS is its agent.

**3.** Administrative Record (AR) at 380 (Solicitation Section K).

CBE or a longer period proposed by an offeror.

On May 10, 2000, USPS held a pre-proposal conference with representatives of the prospective offerors, including plaintiff's proposal manager, Ronald D. Owens. Many questions were addressed at the conference, but Mr. Owens did not raise concerns about the delivery dates or ABS requirements. The contracting officer (CO) emphasized that the award could be made without discussion, so the offerors should each respond to the Solicitation with their best offer.

On May 15, 2000, the CO issued Amendment Modifications–1 to the Solicitation allowing for adjustments to the delivery dates. Specifically, this change provided:

> The contract(s) awarded under this solicitation will be for a term of six years, with a single 6 year renewal term with beginning contract/delivery dates of September 10, 2000 and July 1, 2001. These contract/delivery dates in the initial term and any renewal term may be adjusted at the discretion of the Contracting Officer.[4]

By May 26, 2000, plaintiff and eleven[5] other offerors submitted timely technical/management proposals for the first stage of the procurement. Plaintiff qualified its proposal as to Delivery Date A by proposing to deliver approximately one-third of the 1,637 trailers on September 10, 2000, and the remaining two-thirds on November 10, 2000. Plaintiff also offered to postpone Delivery Date B by 30 days for all trailers, changing the date from July 1, 2001 to August 1, 2001, even though plaintiff asserts it had no problem meeting the original deadline. Plaintiff alleges it proposed the change to Delivery Date B to maintain consistency with the time interval between the two delivery dates. TIP's proposal asserted that it would meet the delivery dates as listed.

In addition, plaintiff proposed to delete Article B.4[6] from the Solicitation. This provision allowed USPS to order an additional 50 trailers per DN group, over and above the base quantities, for the first three years of the Contract, if necessary. Plaintiff contends this clause complicated the already difficult task of meeting Delivery Date A. Plaintiff took exception to the Delivery Date A, Delivery Date B, and Article B.4 requirements in its proposal submitted May 24, 2000. No offeror, including plaintiff, ever challenged the ABS requirements.

Mr. Owens claims he spoke with the CO by telephone on or about June 5, 2000, informing him that plaintiff could not meet Delivery Date A for all DN groups. Plaintiff asserts Mr. Owens then requested an amendment of the delivery date, which the CO denied. Mr. Owens conveyed to his superiors the CO's denial of his request, and they reached a consensus decision that plaintiff could not meet the deadline for all DN groups. Given the risks of performance, plaintiff maintains it made no business sense for it to propose an offer on fewer than all DN groups. As a result, Mr. Owens called the CO on June 5, 2000, confirming with him that plaintiff would withdraw from the Solicitation. The CO suggested that plaintiff express this decision in writing, so by letter dated June 6, 2000, plaintiff officially left the procurement. This letter was brief and did not explain the reasons for plaintiff's withdrawal.

Pursuant to the Solicitation, the CBE occurred on June 8, 2000 with eleven of the remaining offerors participating. Plaintiff did not compete, as it had withdrawn. Per the Solicitation terms, TIP was the lowest bidder on the entire scope of work for all DN groups.

Shortly after the CBE, USPS upper-level management began to debate whether it should buy or lease the trailers (hereinafter referred to as the "buy/lease analysis"). This analysis took several weeks, and it delayed the award of the Contract. On August 4, 2000, the CO asked the offerors who had participated in the CBE to extend the acceptance period for their offers due to the delay.

The vice president of purchasing and materials and the manager of national mail trans-

---

4. AR at 439 (Amendment Modifications–1).

5. TIP asserts that 13 suppliers submitted proposals.

6. The so-called "preferred provider clause."

portation purchasing approved an award to TIP on August 15, 2000. They notified TIP by electronic mail on September 8, 2000 that it had been awarded the Contract. Defendant sent a formal award notification to TIP on September 9, 2000. Based on USPS's internal budgetary organization, TIP received 39 separate contracts related to the DN groups (collectively referenced in this opinion as the "Contract") with a total amount exceeding $100,000,000 for a six-year term and one six-year option to renew. After TIP received the award, the CO extended Delivery Date A from September 10, 2000 to November 30, 2000.

Pursuant to the administrative remedy provided in the PM, plaintiff filed a protest on September 25, 2000, before the USPS General Counsel challenging the extension of Delivery Date A. Plaintiff asserted that the CO was aware of its need to extend Delivery Date A, and his refusal to do so at the time forced plaintiff to withdraw from the Solicitation. By decision dated March 9, 2001,[7] the General Counsel dismissed the protest on timeliness grounds because plaintiff had filed it more than ten days after plaintiff should have known the basis for protest.[8]

While its first protest was still pending, plaintiff filed a second action before the USPS General Counsel on December 4, 2000, claiming defendant had relaxed the ABS requirement. The General Counsel immediately dismissed this protest as untimely on December 6, 2000. Subsequent to this second protest, however, defendant deleted the ABS requirement for trailers manufactured prior to March 1, 1998, for 27 of the 39 contracts making up the Contract. The CO later issued a second modification that revoked the first one—the effect of which was to reinstate the ABS requirement for all trailers.

On March 29, 2001, plaintiff filed a complaint with this court claiming that the award of the Contract to TIP was arbitrary, capricious, and contrary to applicable statutes and regulations. Plaintiff submitted an amended complaint on April 12, 2001. The bases of this action are the ABS requirements and

defendant's alleged relaxation of Delivery Date A. Plaintiff seeks permanent injunctive relief, a declaration that TIP's contract is null and void, and a recompetition of the procurement or, in the alternative, bid proposal costs. Plaintiff also requests attorney's fees and other relief deemed just by the court. Accompanying its complaint was a motion for preliminary injunction.

The court granted TIP's motion to intervene on April 9, 2001. Defendant submitted an answer on April 13, 2001. On April 26, 2001, the court held oral argument on plaintiff's motion for preliminary injunction. In a bench ruling issued that day, the court determined that it has jurisdiction and plaintiff has standing, but it denied plaintiff's motion for preliminary injunction because plaintiff failed to prove by clear and convincing evidence that it was entitled to immediate injunctive relief. Plaintiff then filed a motion for judgment on the administrative record on June 5, 2001 stating: (1) it has standing to bring its claim; (2) the court has jurisdiction to hear this case; and (3) the administrative record proves that USPS violated the procedures set forth in the PM and that the CO acted irrationally, thus prejudicing plaintiff. Defendant submitted a cross-motion for judgment on the administrative record on June 25, 2001 asserting: (1) the court lacks jurisdiction over plaintiff's claim; (2) plaintiff has failed to prove it was prejudiced by the modification of Delivery Date A and the alleged change to the ABS requirements; and (3) plaintiff cannot meet the standard for injunctive relief. TIP filed its opposition to plaintiff's motion on June 25, 2001. The court conducted oral argument on the parties' cross-motions on August 2, 2001 in Washington, D.C.

## Discussion

I. Jurisdiction

### A. Subject Matter Jurisdiction

This court's bid protest jurisdiction is set forth in the Tucker Act, which provides:

the Unites [sic] States Court of Federal Claims ... shall have jurisdiction to ren-

---

7. Plaintiff received this decision on March 13, 2001.

8. AR at 1061 (General Counsel's Decision on Protest No. 00–24).

der judgment on an action by an interested party objecting to a solicitation by a *Federal agency* for bids or proposals for ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. 28 U.S.C. § 1491(b)(1) (Supp.II.1996) (emphasis added). In 1996, Congress enacted the Administrative Disputes Resolution Act, Pub.L. No. 104–320 § 12,110 Stat. 3870, 3874–75 (1996) (ADRA), which expanded the court's bid-protest jurisdiction to hear both pre- and post-award challenges.

Defendant emphasizes that the court's power to grant equitable relief is limited to bid protests challenging a procurement by a federal agency. It asserts that subject matter jurisdiction is lacking over plaintiff's claim because USPS is not a federal agency. Plaintiff contends there is well-established precedent that has affirmatively concluded that USPS is a federal agency.

The court has already determined that it has jurisdiction in this case. Its bench ruling issued April 26, 2001, relied on *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 220 (2001) which held "[as] an independent establishment of the executive branch of the Government of the United States" the USPS falls within the definition of "federal agency," and therefore, comes within the reach of the ADRA. *Emery* was recently affirmed by the Court of Appeals for the Federal Circuit (Federal Circuit), which clearly held that USPS is a federal agency subject to jurisdiction in this court in government procurement suits. 264 F.3d 1071, 1083–84 (Fed.Cir.2001). Indeed, the present case is properly before this court.

**B.** *Standing*

■ The Tucker Act provides that a protestor must be an "interested party" in order to have standing for a bid protest action. 28 U.S.C. § 1491(b)(1); *Cincom Sys., Inc. v.*

*United States,* 37 Fed.Cl. 663, 669 (1997). The statute does not explain, however, who is an interested party. Until recently, it was unclear whether the Tucker Act adopted the liberal standing requirements of the Administrative Procedure Act (APA) or the more restrictive General Accounting Office (GAO) test established in 31 U.S.C. § 3551(2). The decisions of the Court of Federal Claims have split on which test to apply. *See, e.g., Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 644 (2001); *AFL–CIO v. United States,* 46 Fed.Cl. 586, 595 (2000); *CCL, Inc. v. United States,* 39 Fed.Cl. 780, 790 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 663, 669–670 (1997).

The Federal Circuit recently addressed this issue in *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294 (Fed.Cir.2001). It emphasized that the ADRA clearly "made the APA standard of review applicable to all bid protest actions." [9] *Id.* at 1300. The court was not convinced, however, "that Congress, when using the term 'interested party,' ... intended to confer standing on anyone who might have standing under the APA." *Id.* at 1302. Indeed, the GAO standard is the proper gauge as to who is an interested party. *Id.* at 1301. Such persons must be an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* In its April 26, 2001 bench ruling, the court concluded plaintiff satisfies this test. Nothing stated at oral argument or mentioned in the parties briefs persuades the court to change this determination.

The Federal Circuit relies on various factors when determining whether a protestor has the requisite economic interest, which include, but are not limited to, whether the protestor (1) submitted a proposal; (2) withdrew from the procurement; or (3) rated below second among prospective bidders. *See Impresa Construzioni Geom. Domenico*

---

**9.** It is still not clear, however, whether the APA standard of review applies to USPS protests, as they are unique in nature. *See* 39 U.S.C. § 410(a). The Federal Circuit chose not to decide this issue in *Emery,* commenting that the judicial review provisions of the APA are not jurisdictional. 264 F.3d at 1084–86. The parties in *Emery,* therefore, waived any arguments concerning APA review because they never challenged its application in their briefs or at oral argument. *Id.* Accordingly, the Federal Circuit applied the APA's review strictures in that case. *Id.* The parties in the present case also have not challenged the application of the APA. The court will, therefore, consider their arguments in light of the APA standards.

*Garufi v. United States,* 238 F.3d 1324, 1334 (Fed.Cir.2001) (citations omitted). These contractors lack the requisite economic interest in the outcome of the case because if the protest is successful the award would still go to another party. *Id.* Defendant argues that plaintiff has failed to prove an economic interest because it withdrew from the procurement. Defendant relies heavily on *Fed. Data Corp. v. United States,* 911 F.2d 699, 705 (Fed.Cir.1990) (holding that an unsuccessful bidder who had withdrawn from the procurement was not an interested party) to support its claim.[10]

Although the Federal Circuit concluded in *Federal Data* that a withdrawing contractor does not have the requisite economic interest, the facts of that case are different from those before this court. The plaintiff in *Federal Data* was only seeking bid preparation costs for the solicitation and its protest costs and attorneys fees. *Id.* at 704. It was not asking for a resolicitation of the disputed contract. *Id.* The plaintiff, therefore, had no chance of receiving award of the contract because it withdrew from the procurement and was not seeking a reprocurement. As the Federal Circuit determined, under those circumstances the plaintiff did not have the requisite economic interest in the contract. *Id.*

■ In contrast, plaintiff in the present case is seeking a resolicitation of the Contract. Indeed, if the court concludes that defendant improperly extended Delivery Date A and mistakenly included the ABS requirements, it seems the Contract will have to be reprocured. This case, therefore, is more closely related to *Impresa* than *Federal Data.* The Federal Circuit concluded in *Impresa* that, even though the protestor was deemed nonresponsible, if its protest were allowed it would have the opportunity to compete in the resolicitation. 238 F.3d at 1334. This satisfied the GAO standard's requirement that the protestor be a "prospective bidder." *Id.* The protestor also had an economic interest because it had a "substantial chance" of receiving the award in the

reprocurement. *Id.* (citing *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999)). The Federal Circuit distinguished *Federal Data* and clearly held that even when a protestor had no chance to receive award in the initial procurement, it has standing to protest when the action, if successful, would require resolicitation. *Id.*

■ In addition, the GAO has held in various cases that a protestor is a "prospective bidder" when it has a reasonable likelihood of success in any recompetition required as a remedy. *See Inter–Con Security Sys., Inc.,* Comp. Gen. Dec. B–235,248 (17 August 1989), 89–2 CPD ¶ 148, 1989 WL 241034 (offeror not in line for award could challenge protest because it could participate in the corrected procurement); *Big State Enterprises,* Comp. Gen. Dec., B–218,055 (13 June 1985), 85–1 CPD ¶ 680, 1985 WL 53010 (offeror not in line for award could challenge protest because it could participate in the corrected procurement); *Olympia USA, Inc.,* Comp. Gen. Dec. B–216,509 (8 November 1984) 84–2 CPD ¶ 513, 1984 WL 46902 (where remedy to protest would be resolicitation, nonresponsiveness of the protestor's bid is irrelevant since the question is whether it can compete in recompetition). Although GAO decisions are not binding on this court, *DGS Contract Serv., Inc. v. United States,* 43 Fed.Cl. 227, 238 (1999), they serve as persuasive authority. These Comptroller General decisions are especially relevant when interpreting the GAO's definition of "interested party."

In the case at issue, plaintiff submitted a timely technical proposal for the first stage of the procurement. Plaintiff's inclusion of different delivery dates did not preclude acceptance of this offer, as the CO said he would score it accordingly.[11] Plaintiff asserts it later withdrew its bid because it believed the CO would not extend the delivery dates per its request. Despite the CO's alleged statements that it would not change the delivery dates, he later extended them to dates similar to what plaintiff proposed. Plaintiff now challenges this action as arbitrary and capricious. If the court allows

---

**10.** Transcript of Oral Argument held August 2, 2001 (Tr. of OA) at 40.

**11.** AR at 933 (Contracting Officer's statement).

plaintiff's protest, the Contract would seemingly have to be resolicited. Since plaintiff was a participant in the first stage of the procurement, it would have the opportunity to compete in this recompetition. Plaintiff is a "prospective bidder" under the GAO standard therefore, pursuant to *Impresa.*

Furthermore, the delivery dates in the new solicitation would presumably be set with a time frame similar to what plaintiff proposed. As long as the terms of the resolicitation remedy the problems plaintiff had with the original procurement, there is no reason plaintiff could not successfully compete for award in the recompetition.[12] Based on the decision in *Impresa,* therefore, plaintiff has a substantial chance of receiving award. Indeed, plaintiff satisfies the standing requirements of the GAO test.

## II. Summary Judgment

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the opposing party to show that a genuine issue exists. *Sweats Fash-*

*ions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the opposing party's case, then the burden shifts to the opposing party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

▪ The court reviews challenged agency decisions under the standards set forth in the APA. 5 U.S.C. § 706 (1994); *Impresa,* 238 F.3d at 1332. In particular, the court must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706. A bid award may be set aside, therefore, "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement proce-

---

12. The fact that plaintiff also contested Delivery Date B and Article B.4 does not preclude plaintiff's chances for receiving award during a resolicitation. Plaintiff asserts it objected to these two items only because of their relation to Delivery Date A. Plaintiff contends if Delivery Date A is adjusted, it could still meet Delivery Date B. In addition, there would be more time to provide the extra trailers allowed under Article B.4.

dure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332 (pursuant to the ADRA, all bid protest cases are now reviewed under the standards applied in the *Scanwell* line of cases) (citations omitted).

■■■ When evaluating whether the agency official's actions were rational, the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Contracting officials, however, may properly exercise wide discretion in their application of procurement regulations. *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa,* 238 F.3d at 1333 (citing *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994)). Moreover, when a protestor is asserting a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* (citing *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)).

■■■ In addition, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.

Cir.1996). To establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir. 1996).

Plaintiff argues defendant's actions were arbitrary and capricious because: (1) the CO improperly extended Delivery Date A and (2) the Solicitation's requirement for ABS was unduly restrictive. Defendant counters that the CO correctly followed the requirements of the PM when he extended Delivery Date A. Defendant also asserts the safety goals of USPS were a rational basis for including the ABS requirement in the Solicitation.

*A. Delivery Date A*

■■■ Due to the unexpected events caused by upper-level management at USPS, who decided to undergo the extensive buy/lease analysis, the Contract award date was delayed until September 8, 2000. As Delivery Date A was September 10, 2000, it was impossible for the awardee to meet this deadline in two days. The CO had no choice but to extend the delivery deadline.[13] The court must determine whether this extension was properly made.

Since this case involves a USPS contract, the applicable provisions are set forth in the PM. *Emery Worldwide Airlines,* 49 Fed.Cl. at 222. USPS is authorized to issue these regulations pursuant to 39 U.S.C. § 401 and 39 C.F.R. Part 601. *See Id.* (citing *Modern Sys. Tech. Corp. v. United States,* 979 F.2d 200, 202–03 (Fed.Cir.1992); *T & S Prods., Inc. v. United States,* 48 Fed.Cl. 100, 104 (2000)). The PM has the force and effect of law. 39 U.S.C. § 401; *Florida, Department of Insurance v. United States,* 33 Fed.Cl. 188, 192 (1995); *De Matteo Constr. Co. v. United States,* 220 Ct.Cl. 579, 600 F.2d 1384 (1979).

Plaintiff maintains defendant's relaxation of Delivery Date A was arbitrary and capricious because it violated Section 4.2.2.g(1) of the PM. Plaintiff contends the CO was re-

---

**13.** Also, when the CO realized the buy/lease analysis was going to delay the award of the Contract, he asked the offerors to extend their proposals for 30 days. None of them protested this postponement of the award. Plaintiff was no longer an offeror at this stage of the procurement; it was unnecessary, therefore, for the CO to alert it that the award would be delayed.

quired to issue a formal amendment before extending Delivery Date A. Plaintiff also suggests that without said amendment, it was irrational for the CO to not resolicit the Contract instead of awarding it as modified. In addition, plaintiff asserts the CO was required to inform it of any changes concerning Delivery Date A because he was aware that the small lead time allowed by the original deadline was the only reason plaintiff withdrew from the procurement.

Defendant argues that Amendment Modifications–1 gave the CO the discretion to adjust the delivery dates without issuing a formal amendment. Defendant also challenges plaintiff's claim that the CO should have notified it of any changes to Delivery Date A, even though plaintiff had withdrawn from the procurement. Defendant further asserts that Section 1.3.2.b in the PM allows deviations from its requirements as long as they are approved by the proper officials.

The parties' arguments present the court with questions of contract interpretation. The court may rule on such interpretations as a matter of law. *Nat'l Rural Utils. Coop. Fin. Corp. v. United States,* 14 Cl.Ct. 130, 136 (1988), *aff'd,* 867 F.2d 1393 (Fed.Cir. 1989). Due to the absence of specific federal statutes that govern the interpretation of contracts, the courts have crafted a federal common law for government contracts. *See United States v. Seckinger,* 397 U.S. 203, 209, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). These rules apply to interpretation disputes over language found in solicitations for government contract work as well as for executed contracts. *See, e.g., Chas. H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 722 (1999) (citing *B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 299, 614 F.2d 748 (1980)).

The court interprets Amendment Modifications–1 as giving the CO the discretion to change the delivery dates. It emphasizes that:

> The contract(s) awarded under this solicitation will be for a term of six years, with a single 6 year renewal term with beginning contract/delivery dates of September 10,

2000 and July 1, 2001. *These contract/delivery dates* in the initial term and any renewal term *may be adjusted at the discretion of the Contracting Officer.*[14]

No one, including plaintiff, protested this grant of discretion to the CO to modify the delivery dates. The fact that the amendment grants the CO this authority, however, is not dispositive, as this amendment must comply with the terms of the PM or it is invalid. *See* PM § 1.3.1.a ("Conformance with PM requirements promotes consistency and integrity throughout Postal Service purchasing.").

Section 4.2.2.g(1) of the PM provides:

> Solicitations *must be amended* when changes such as quantity, specifications, *delivery schedule,* date of receipt of proposals, or changes to clarify or correct solicitation ambiguities or defects must be made. When solicitations are amended, suppliers must be provided sufficient time to consider the amendment in the preparation or revision of their proposals.[15]

This provision mandates that a change in delivery schedule must be accomplished by amending the Solicitation. Defendant altered Delivery Date A by extending it for approximately 80 days. The issue, therefore, is whether modifying a delivery date constitutes a change in the delivery schedule. Specifically, is such a change a *material* alteration of the delivery schedule that makes the Contract as awarded different from the Contract as solicited. *See GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 784 (1997) (commenting that the basic standard in a bid protest case involving a modification is whether the modification materially changed the field of competition). If it does, Section 4.2.2.g(1) requires the CO to amend the Solicitation before extending this delivery deadline. Otherwise, the field of competition is unfairly changed because "the modification allows the awardee to perform the contract in a manner that disappointed bidders could not have anticipated from the terms of the solicitation." *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 784 (1997) (citing *Bangar Contractors Corp.,* Comp. Gen. Dec. B–

---

**14.** AR at 439 (Amendment Modifications–1) (emphasis added).

**15.** AR, Exhibit (Ex.) 36 (PM § 4.2.2.g(1)) (emphasis added).

240,071 (16 October 1990), 90–2 CPD ¶ 295, 1990 WL 278547).

The key aspect of the delivery schedule in this case is the amount of lead time between the date of award of the Contract and Delivery Date A. Plaintiff views the solicited lead time as too short, asserting it forced plaintiff to withdraw from the procurement. Plaintiff challenges the lead time of the Contract as awarded because it is much longer than what plaintiff believes the Solicitation allowed. Plaintiff argues that the PM requires such a change to be made through formal amendment to the Contract.

Section K.2 of the Solicitation established that:

> The acceptance period for all proposals (including price bids submitted during the CBE) will be 60 days after the date of the CBE or a longer period proposed by an offeror.[16]

Plaintiff reads this provision as mandating that the last possible date of award was August 7, 2000, which is 60 days after the CBE. Plaintiff, therefore, considered the lead time to be only 34 days—the period between August 7, 2000 and September 10, 2000. Although a bidder could keep its offer open for a longer period of time, it is reasonable to conclude that the Contract would be awarded anytime between the completion of the CBE and August 7, 2000. This does not mean, however, that the lead time between the Contract award date and Delivery Date A was necessarily 34 days, as plaintiff maintains. The Solicitation did not provide for an exact lead time. It was possible, although unlikely, that the Contract would be awarded the day after the CBE, thus allowing a lead time of 94 days. The lead time, therefore, ranged from 34 days to 94 days. The bidders presumably took this into consideration when making their proposals. It seems plaintiff was the only party to the procurement who believed the lead time was solely 34 days.

Moreover, as plaintiff admits, the CO stated at the pre-proposal conference that the Contract would be awarded in mid-June.[17] Since Delivery Date A was September 10, 2000, this allowed an approximate 80–day lead time for the awardee to meet Delivery Date A. Due to the delay, the Contract was not awarded until September 8, 2000. The CO then changed Delivery Date A to November 30, 2000, to maintain the approximate 80 day lead-time.[18] This 80 days was well within the 34–94 day range of lead times allowed by the Solicitation.

The delivery schedule was not materially altered, therefore, because the time period between the date of award and the first delivery date was maintained. Only the date of Delivery Date A was changed, so it was unnecessary for the CO to issue a formal amendment pursuant to Section 4.2.2.g(1). The Contract as awarded was not different from the Contract as solicited. The court reaches this conclusion due to the consistency between the lead times for delivery. Clearly if the CO had changed Delivery Date A in a way that created a much different lead time, such as 150 days, this would have been a material alteration requiring amendment. No amendment is necessary, however, per the circumstances of this case. The CO's decision complied with the requirements of the PM. To hold otherwise would imply that every time a contract award is delayed, the contract would have to be resolicited. The inefficiencies and costs of such a rule would greatly hinder the procurement process.

■ Moreover, assuming *arguendo* that the extension of Delivery Date A was a material change requiring amendment to the Solicitation, Amendment Modifications–1 satisfies this requirement. The court interprets this amendment as a provision that covers all changes to delivery dates. Even though it was issued well before the CO altered Delivery Date A, the court concludes it satisfied

---

16. AR at 380 (Solicitation Section K).

17. Transcript of Preliminary Injunction Hearing held April 26, 2001 (Tr. of Prelim. Inj. Hr'g) at 15–16.

18. *See Id.,* Joint Ex. 1 at 54 (Deposition of Russell Sykes).

any duty by defendant to amend the Solicitation.[19]

As defendant complied with Section 4.2.2.g(1) of the PM, its actions did not violate the law. Unless the CO acted irrationally, therefore, defendant's conduct with respect to Delivery Date A was not arbitrary or capricious.

Plaintiff suggests it was irrational for defendant to extend Delivery Date A without resoliciting the Contract. Plaintiff also asserts the CO should have provided it notice that he was changing the delivery date. Defendant contends no resolicitation or notice of the change was necessary.

■ Plaintiff's argument seeking resolicitation is contrary to the principles of the PM. Section 4.2.2.h provides:

> *Cancellation of Solicitations.* As the solicitation process is costly both to the Postal Service and suppliers, solicitations should be canceled for only the most compelling reasons and cancellation should be made as early in the process as possible.

The Solicitation procedures were complete, and all that was pending was award of the Contract before USPS officials delayed this decision to perform the buy/lease analysis. This business decision is not a compelling reason to force recompetition of the Contract. The CO properly asked the offerors to extend their proposals until this analysis was complete. The necessity of changing Delivery Date A as a consequence does not mandate abandoning the successful Solicitation. This would be very costly to all parties involved. The CO's decision to not resolicit was rational.

Plaintiff's request for notice is also unpersuasive. Plaintiff argues the CO should have notified it of his extension of Delivery Date A since he knew the only reason plaintiff withdrew from the procurement was its difficulty meeting the 34-day lead time.[20] Plaintiff relies heavily on the court's decision in *Candle Corp. v. United States,* 40 Fed.Cl. 658, 665 (1998) and an opinion by the Comptroller General to support its claim. *See Information Ventures, Inc.,* Comp. Gen. Dec. B–232,094 (4 November 1988), 88–2 CPD ¶ 443, 1988 WL 228110. In *Candle Corp.* the court held that it is unfair to deny a non-proposing offeror the opportunity to compete on the solicitation terms relaxed upon award. 40 Fed.Cl. at 665. Plaintiff, however, is misinterpreting this case. The protestor in *Candle Corp.* participated fully in the procurement, unlike plaintiff who withdrew before the second stage. The Court concluded the agency was required to notify all offerors that the evaluation criteria had changed. *Id.* The court did not indicate that a nonparticipating offeror similar to plaintiff had to be informed of the change in the Solicitation or be drawn back into the competition.

In *Information Ventures,* the Comptroller General concluded that a bidder who withdrew must be notified and allowed to participate in a recompetition when the solicitation delivery schedule is relaxed upon award, and the agency *has knowledge* that the protestor's reason for withdrawing is directly related to these delivery requirements. Comp. Gen. Dec. B–232,094 (4 November 1988), 88–2 CPD ¶ 443, 1988 WL 228110 (emphasis added). Plaintiff has not shown, however, that the CO actually knew its reasons for withdrawing from the procurement.[21] The

---

**19.** Defendant's additional argument that PM Section 1.3.2.b allowed the CO to deviate from the provisions of 4.2.2.g is unpersuasive because defendant has failed to prove that the proper procedures were followed for seeking a deviation. This is irrelevant, however, as the court concludes the PM did not require formal action by the CO with respect to Delivery Date A.

**20.** As discussed above, plaintiff's suggestion that there was a 34-day lead time is an improper interpretation of the Solicitation.

**21.** In Count II of the First Amended Complaint, plaintiff alleges the CO acted in bad faith be-

cause, when Mr. Owens informed him that plaintiff would have to withdraw as a consequence of Delivery Date A, the CO already knew Delivery Date A would be significantly extended. Plaintiff asserts the CO purposefully withheld this information from plaintiff. In his deposition, the CO denied any wrongdoing. Plaintiff now concedes there is insufficient information in the administrative record to meet its burden to demonstrate that USPS acted in bad faith. Plaintiff XTRA Lease, Inc.'s Motion For Judgment On The Administrative Record (Pl.'s Mot.) at 15, n. 4; *see also Labat-Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 849 (1999) ("well-nigh irrefragable" proof is required to establish bad faith by govern-

CO did have telephone conversations with Mr. Owens about Delivery Date A, but plaintiff's withdrawal letter specified no reasons for withdrawal. In his deposition, the CO stated he was unaware of the reasons for plaintiff's withdrawal.[22] As plaintiff concedes, the CO advised that he would accept plaintiff's proposal and score it accordingly.[23] Plaintiff was not precluded from participating in the competition, therefore, but it still chose to withdraw for reasons perhaps unrelated to Delivery Date A. Plaintiff has admitted that it withdrew for business reasons related to profit and risk.[24] In contrast, the offeror in *Information Ventures* sent two letters explaining exactly why it was withdrawing.[25] *Id.*

Plaintiff's argument for receiving notice of the extension of Delivery Date A, therefore, is unpersuasive. Plaintiff was no longer participating by this stage of the procurement. It was unnecessary for the CO to inform plaintiff that he was changing the delivery date, especially when it was unclear why plaintiff had withdrawn from the procurement.

Because the extension of Delivery Date A was not a material change to the delivery schedule, and since Amendment Modifications-1 granted the CO the discretion to alter Delivery Date A, defendant's actions did not violate the requirements of the PM. It was also impossible to award the Contract without said alteration due to the buy/lease analysis, and therefore the CO's decision was rational based on the circumstances. The court concludes that the CO's extension of

Delivery Date A was not arbitrary or capricious.

### B. *ABS Requirement*

■ Various decisions by the GAO and General Services Board of Contract Appeals have held that a solicitation must seek proposals that meet an agency's minimum needs, or else the solicitation represents an undue, improper restriction on competition. *See SMS Systems Maintenance Services, Inc.*, Comp. Gen. Dec. B–270, 816 (29 April 1996) 96–1 CPD ¶ 212, 1996 WL 207103; *Federal Data Corp. v. Dept. of Justice*, GSBCA No. 12264–P, 94–1 B.C.A. ¶ 26,324 (March 25, 1993) (solicitations must have a rational basis for agency needs and not be unduly restrictive); *Integrated Systems Group, Inc. v. Dept. of Navy*, GSBCA No. 12127–P, 93–2 B.C.A. ¶ 25,637 (November 30, 1992). Section 2.3.1.a.(3) of the PM states:

> In order to enhance competition and invite innovation, specifications and statements of work should be written in as non-restrictive a manner as possible.

Plaintiff asserts the ABS requirement was arbitrary and capricious because it had no rational basis and was unduly restrictive of competition in violation of PM § 2.3.1.a(3). Plaintiff requests defendant amend the Solicitation to state USPS's minimum needs in the least restrictive fashion possible. Plaintiff then wants USPS to resolicit the Contract.[26]

Plaintiff is relying on its belief that USPS did not have a general policy mandating ABS, and therefore, the ABS requirement

---

ment employees). Accordingly, plaintiff does not seek judgment on the administrative record for Count II.

**22.** Tr. of Prelim. Inj. Hr'g, Joint Ex. 1 at 74 (Deposition of Russell A. Sykes).

**23.** Pl.'s Mot. at 29, n. 9.

**24.** Tr. of Prelim. Inj. Hr'g at 11, 50.

**25.** Moreover, *Candle Corp.* and *Information Ventures* both applied the Competition in Contracting Act (CICA) and the Federal Acquisition Regulations (FAR), neither of which govern USPS procurements. *See* 39 U.S.C. § 410(a) ("no Federal law dealing with public or Federal contracts ... shall apply to the exercise of the powers of

the Postal Service"). This is significant because CICA and the FAR require agencies to engage in "full and open competition," 10 U.S.C. § 2305(a)(1)(A)(i) while USPS is only subject to an "adequate competition" standard. According to PM Section 1.7.1.a., USPS obtains adequate competition when: (1) it receives a sufficient number of bids, generally at least two; (2) there was no deliberate exclusion of a competitor; and (3) it obtains reasonable prices. *See Paul J. Rocco d/b/a Paul's Trucking*, USPS Protest No. 89–40, July 21, 1989.

**26.** According to plaintiff, the ABS requirement greatly increased the difficulty of meeting Delivery Date A and was difficult and expensive to satisfy. Plaintiff adds that trailers with ABS are hard to procure and, in most instances, existing trailers had to be modified to include them.

did not reflect USPS's minimum needs. To support this theory, plaintiff cites the CO's deposition where he commented that he believed there was such a policy but was unsure as to why some USPS contracts required it and some did not.[27] He could not explain how this is consistent with a policy requiring ABS on all trailers.[28] Plaintiff also interprets the events occurring subsequent to award as evidence that there was no such policy. Specifically, in March 2001 defendant deleted the ABS requirement for trailers manufactured prior to March 1, 1998 from 27 of the 39 contracts making up the Contract.[29] The CO later issued a second modification, however, revoking this change. The ABS requirement is still in effect for all trailers.[30]

Plaintiff's argument based on the modifications that first rescinded the ABS provision and then reinstated it is unpersuasive because, as just stated, the ABS requirement is still in effect. Plaintiff also ignores the CO's further deposition testimony explaining that placing ABS on all trailers is a safety goal of USPS.[31] The CO added that "ABS ensures the highest quality of safety out on the road."[32] Indeed, Mr. Owens conceded that other contracts plaintiff has with defendant require ABS. In addition, DOT regulations require all new trailers to have ABS. 49 C.F.R. § 571.121(S5.2.3) (2000).

The determination of an agency's minimum needs is a matter within the broad discretion of agency officials. *Input/Output Tech., Inc. v. United States,* 44 Fed.Cl. 65, 72 n. 9 (1999). It is not the duty of the court to second guess such determinations. *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 672 (1997). Plaintiff has failed to prove that it was irrational for defendant to incorporate the ABS requirement into the Solicitation, especially in view of the DOT standard. The

requirement also did not violate the PM because it was not unduly restrictive. The court concludes that it was properly included in the Solicitation.

Plaintiff, therefore, has failed to show "a clear and prejudicial violation of applicable statutes or regulations," *Impresa,* 238 F.3d at 1333, with respect to Delivery Date A and the ABS requirements. It also has not established that the agency's decision "had no rational basis." *Id.* As plaintiff has unsuccessfully shown that defendant's actions were arbitrary or capricious, it is unnecessary to consider whether plaintiff also experienced competitive prejudice.[33]

*Conclusion*

For the above-stated reasons, plaintiff's motion for judgment on the administrative record is hereby DENIED because plaintiff has failed to establish that defendant's actions were arbitrary or capricious and not in accordance with the law. Defendant's cross-motion for judgment on the administrative record, however, is hereby ALLOWED. The Clerk is directed to dismiss plaintiff's complaint. No costs.

IT IS SO ORDERED.

---

**27.** Tr. of Prelim. Inj. Hr'g, Ex.1 at 14 (Deposition of Russell Sykes).

**28.** *Id.*

**29.** TIP responds that it never received fully executed modifications eliminating ABS.

**30.** Tr. of OA at 67.

**31.** Tr. of Prelim. Inj. Hr'g, Ex.1 at 17 (Deposition of Russell Sykes).

**32.** *Id.* at 17.

**33.** There is also no reason to discuss plaintiff's request for permanent injunctive relief and bid proposal costs, as these are theories of damages and equitable relief granted to plaintiffs who establish liability. Plaintiff has failed to prove that defendant is liable in this case.